Affirmed and Memorandum Opinion filed May 17, 2007








Affirmed and Memorandum Opinion filed May 17, 2007.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-05-01085-CR

____________

 

WILLIAM PATRICK JEFFERSON, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 208th
District Court

Harris County, Texas

Trial Court Cause No. 985,653

 



 

M E M O R A N D U M   O P I N I O N

Appellant, William Patrick Jefferson, was found guilty by a
jury of the capital murder of his five year-old stepson.  See Tex. Penal Code Ann. '' 19.02(b)(1),
19.03(a)(8) (Vernon 2003 & Supp. 2006).  The trial court assessed
punishment at incarceration for life in the Texas Department of Criminal
Justice, Institutional Division.  In three issues, appellant challenges the
legal and factual sufficiency of the evidence, and the trial court=s order denying
his motion to suppress.  We affirm.








Factual and Procedural Background

Appellant and Amanda Brewer (ABrewer@) lived together
with their three-month-old infant, D.J., and Brewer=s five-year-old
son, Anthony.  Brewer is moderately mentally retarded.[1] 
At approximately 2:00 p.m. on April 24, 2004, appellant and Brewer brought
Anthony to the emergency room at Memorial Hermann Northwest Hospital.  Anthony
was unresponsive.  His pupils were fixed and dilated; his pulse and
respirations were slow. Anthony had eighty-eight separate injuries, including a
human bite mark on his face. Anthony had bruises on his head, face, shoulders,
chest, back, legs, feet, and genitals.  A CT scan of Anthony=s head revealed
that he had recently suffered three separate traumatic head injuries, causing
his brain to bleed and swell.  Appellant told nurses he had been Awrestling@[2] with Anthony
earlier in the day.  Hospital personnel immediately suspected child abuse and
contacted HPD. 








HPD Officer Ronald Olivo detained appellant and Brewer at
the hospital and called for additional officers to assist in the investigation. 
HPD homicide detective Clarence Douglas arrived at the hospital approximately
thirty minutes later.  Douglas interviewed medical personnel at the hospital
and arrested appellant.  At approximately 9:00 p.m., Douglas interviewed
appellant at the offices of HPD Homicide Division.  During the interview,
Appellant told Douglas that Anthony had been in trouble for defecating in a
trash can in the bathroom at his residence sometime during the prior night. 
Appellant stated that he disciplined Anthony by spanking his buttocks with a
house shoe sometime before 10:00 a.m.  Appellant stated that after disciplining
Anthony, appellant prepared breakfast and Anthony ate.  Appellant told Douglas
that he and Anthony started Aplaying@ at approximately
10:00 a.m. Appellant stated:

Well we was wrestlin, I was throwin
him down.  Wasn=t no punches or nothing like that.  That=s all I was just
wrestlin and throwin him down on the mattress in his bedroom.  I don=t know if y=all took pictures
or not, but y=all see the mattress is on the floor.  I did not throw
him on the floor.  I threw him on the mattress.  But I did not think it would
hurt him and apparently it did.  I apologize for that.  

In response to further questioning by Douglas, appellant
stated that Anthony=s injuries must have occurred while he and
Anthony were playing Arough,@ and no one else
was in the room when Anthony was injured:

I did not spank him too hard.  I
guess when I slammed him and, and slammin him on that mattress that=s the only time it
could have happened. . . .  I=m not sayin I wasn=t playin with him,
and I=m not sayin I wasn=t playin with him
rough. . . .  Amanda wasn=t in the room, it was just me and Anthony.
. . . All I, all I did was body slam him on the mattress.     

Appellant stated that after he and Anthony finished
playing, he gave Anthony a bath and put him in bed for a nap.   Anthony was not
able to sit up in the bath tub and started Abreathing bad.@  After putting
Anthony in bed, appellant left the house to give his friend a ride.  When
appellant returned, Anthony was bleeding from his mouth and nose.  Appellant
and Brewer took Anthony to Memorial Hermann Hospital.  Anthony was transferred
to Texas Children=s Hospital where he was pronounced dead at
7:52 a.m. on April 25, 2004.  A Harris County grand jury indicted appellant for
capital murder.  The indictment alleged appellant intentionally and knowingly
caused the death of Anthony, an individual under six years of age, Aby striking
[Anthony] with an unknown object@ and by Astriking [Anthony]
against an unknown object with his hands.@ The audiotape of
appellant=s statement to Douglas, and a written transcript of
the statement, were admitted into evidence at appellant=s trial and
published to the jury. 








Debra Tyler and Brenda Stewart, nurses at Memorial Hermann
Hospital, testified they treated Anthony in the emergency room.  Tyler and
Stewart testified appellant told them he had been wrestling with Anthony
earlier in the day.  Tyler and Stewart further testified, based on their
experience, that neither Brewer nor appellant reacted normally to the news that
Anthony=s injuries could
be fatal.  Brewer did not seem to understand what was happening and displayed
little emotion.  Appellant began pacing back and forth in the hallway outside
of the emergency room, but did not cry. 

Dr. Samuel Smiley, the radiologist on call at Hermann
Hospital, testified he reviewed CT scans of Anthony=s head and
abdomen.  Smiley testified Anthony suffered three separate blows to the outside
of his head, each blow coming from a different direction.  All of Anthony=s head injuries
were recent and consistent with trauma occurring between 9:00 and 11:00 a.m. on
April 24.  Smiley testified the CT scan of Anthony=s head showed
brain hemorrhaging and swelling consistent with Amultiple falls or
multiple hits.@   The amount of force required to cause each of the
subdural hematomas present on the CT scan was equal to the force generated by a
fall onto a concrete floor from a height of five to six feet, at minimum.  Smiley
testified Anthony=s head injuries would likely have rendered
him unconscious.  Smiley further testified Anthony=s abdominal scan
showed three contiguous rib fractures on the left side of his back, with an
underlying injury to his lung.  A Avery severe blow@ would have been
required to cause the injuries to Anthony=s ribs and lung. 
Smiley testified the injuries shown in Anthony=s CT scans were
more consistent with child abuse than anything else.








Dr. Jorge Bu, the pediatrician in charge of the intensive
care unit at Texas Children=s Hospital, testified Anthony=s head injuries
were consistent with severe trauma occurring within twelve hours of his arrival
at Hermann Hospital.  Bu testified Anthony=s head injuries
were caused by impacts with a hard surface and would have rendered him
incapacitated Apretty much immediately.@  Bu further
testified Anthony=s injuries were not consistent with
accidental trauma; rather, they were Aconsistent with an
inflicted injury by an adult-sized individual.@   

Dr. Michelle Lyn, a board certified doctor of pediatric
emergency medicine and expert on the subject of child abuse, testified Anthony=s injuries were
not consistent with play fighting or accidental trauma.  Lyn testified that a Aforceful impact,@ such as a motor
vehicle accident at a speed of sixty miles per hour, was required to cause the
type of head injuries sustained by Anthony.  

Dr. Dwayne Wolf, a board certified forensic pathologist and
deputy chief medical examiner for Harris County, testified about the results of
Anthony=s autopsy.  Wolf
testified Anthony=s death was caused by injuries to his
head.  The manner of death was homicide.  Anthony had eighty-eight separate
injuries, including a human bite mark on his face and bruises Aall over@ his body. 
Autopsy results showed multiple head impacts and subdural hematomas consistent
with an adult person striking the child=s head against an
object Aat or around the
time of the child=s demise.@ None of the fatal
head injuries showed evidence of healing.  

       
  Amanda Brewer testified she moved in with appellant and gave birth to D.J.
during January of 2004.  Anthony lived with his grandmother until March, then
moved in with appellant and Brewer.  Brewer testified Anthony was a Aslow learner@ and was unhappy
about living with appellant.  Approximately one week before his death, Anthony
smeared feces around the bathroom in their apartment.  Brewer testified
appellant became angry, spanked Anthony with a house shoe, and made him clean
the bathroom.  Brewer testified appellant also spanked Anthony on prior
occasions for wetting his bed and urinating on the couch.  Brewer testified she
saw appellant bite Anthony=s face a few days prior to Anthony=s death, and
appellant stated he bit Anthony because he wanted to hear him cry.   








Brewer testified that sometime after she fell asleep on the
night of Friday, April 23, Anthony went into the bathroom and defecated in the
trash can.  Brewer testified appellant brought the trash can into the bedroom
and woke her up to show her what Anthony had done.  Brewer got out of bed at
approximately 10:00 a.m. on Saturday.  Appellant and Anthony were already
awake.  She watched Anthony eat a bowl of Spaghettios at the kitchen table,
then told him to go brush his teeth.  Brewer asked appellant to punish Anthony
for defecating in the trash can and told appellant not to spank Anthony Atoo hard.@  Brewer testified
she did not intend for appellant to beat Anthony.  Brewer went into the kitchen
while appellant and Anthony went into Anthony=s bedroom.  Brewer
testified she heard Anthony say, ANo more dukey in
the trash, I dukey in the toilet.@  Next, she heard
the sound of appellant Awhipping him,@ and heard Anthony
crying Ano more, no more.@  Brewer testified
she heard a Aloud bang . . . like if I hit something hard, like,
you could hear it from the wall of the kitchen.@  Brewer went into
Anthony=s bedroom and saw
Anthony lying on the floor.  Anthony=s head was on a
mattress and the rest of his body was on the floor. Anthony was limp and
unresponsive at all times thereafter.  Appellant told Brewer that he and
Anthony had been Aplay fighting.@  Brewer testified
appellant was Alooking guilty@ and reacted as
though he had dome something wrong.  

Brewer testified Anthony was having difficulty breathing
and appellant gave him CPR.  Anthony urinated on his clothing, and appellant
put Anthony in the bathtub to wash him off.  Brewer testified Anthony=s eyes were open,
but he could not sit up, move, or speak.  Appellant dressed Anthony and laid
him on the bed in the master bedroom.  Thereafter, appellant left the house to
give his friend a ride. Brewer testified that when appellant returned, they
went into the bedroom and saw blood coming from Anthony=s nose.  Brewer
testified they drove Anthony to the hospital, and appellant told her to Amake a lie up@ if they asked her
what happened. 








Appellant testified that Anthony lived with appellant and
Brewer for less than one month before his death, and appellant had disciplined
Anthony on one or two prior occasions.  Appellant testified Anthony usually
spent the weekends with his grandmother and returned home with marks on his
body.  Appellant testified that on the weekend prior to his death, Anthony
returned from his grandmother=s house with Aquite a few@ marks on his
body.  Appellant further testified he saw Brewer spank Anthony on several
occasions.    

Appellant testified Anthony defecated in the trash can in
the bathroom sometime during Friday night.  Appellant woke Brewer up to show
her what Anthony had done, then cleaned the bathroom and went to bed. 
Appellant testified he was not angry.  Appellant prepared breakfast for Anthony
on Saturday morning.  Appellant testified that after Anthony ate breakfast,
appellant went into Anthony=s bedroom and spanked Anthony with a house
shoe to punish him for defecating in the trash can.  Appellant testified he
went into the living room to watch television, then went back into Anthony=s bedroom and Aplayed with him.@ Appellant
testified he was picking Anthony up and swinging him around.  Appellant
testified: AWe just was playing, I was throwing him on the
mattress. . . . Then what happened, he lost his breath or whatever because he
couldn=t - he wasn=t breathing too
good.  Then Amanda came in there and told me to stop playing with him so
rough.  I had forgotten he had asthma.@  Appellant
testified that throwing Anthony onto the mattress was not part of his
punishment.  








Appellant testified that Brewer treated Anthony with an
asthma inhaler and Anthony started breathing normally.  Thereafter, appellant
testified, Awe was in there talking, I was swinging [Anthony]
around while Amanda was talking to me.  She had [D.J.], I had Anthony and he
peed on my shirt.  Then I took him in the bathroom and gave him a bath.@  Contrary to his
statement to detective Douglas, appellant testified Anthony was able to move
his arms and legs and speak while appellant bathed him.  Appellant testified
that after bathing Anthony, he put Anthony in bed and laid down beside him. 
Next, appellant testified, he left the house for fifteen or twenty minutes to
give his friend a ride to the barber shop.  Appellant testified that when he
returned, he went into the bedroom and saw Anthony bleeding from the mouth and
nose.  Appellant testified he gave Anthony CPR, then drove him to the
hospital.   

Appellant called sixteen witnesses to testify, twelve of
whom were friends or relatives who testified they never saw appellant mistreat
any child.  One of appellant=s witnesses, Carlotta Gonzales, was
appellant=s former girlfriend.  Gonzales testified that when she
and appellant ended their relationship, appellant grabbed her by the throat and
choked her, lifting her feet up off of the ground.  

The jury found appellant guilty of capital murder, and the
trial court sentenced appellant to incarceration for life. This appeal
followed.

Discussion

I.
The Trial Court Did Not Err in Denying Appellant=s Motion to
Suppress 

In his third issue, appellant contends the trial court
erred in denying his motion to suppress his oral statement to detective
Douglas.  Appellant argues his statement should have been suppressed because it
was the product of a warrantless arrest made without probable cause.  The State
argues testimony at the suppression hearing established that the arresting
officer had probable cause to believe appellant had committed an assault
resulting in bodily injury to a family member, thereby justifying the warrantless
arrest of appellant pursuant to article 14.03(a)(4) of the Code of Criminal
Procedure.  Tex. Code Crim. Proc. Ann.
art. 14.03(a)(4) (Vernon Supp. 2006). 








A bifurcated standard of review is applied to a trial court=s ruling on a
motion to suppress evidence.  Guzman v. State, 955 S.W.2d 85, 89 (Tex.
Crim. App. 1997).  An appellate court affords almost total deference to a trial
court=s determination of
historical facts supported by the record, especially when the trial court=s findings are
based on an evaluation of credibility and demeanor.  Id.  The appellate
court affords the same amount of deference to a trial court=s ruling on mixed
questions of law and fact if the resolution of those questions turns on an
evaluation of credibility and demeanor.  Id.  The court reviews de
novo those questions not turning on credibility and demeanor.  Id.  At
a suppression hearing, the trial court is the exclusive trier of fact and judge
of the credibility of the witnesses.  Mason v. State, 116 S.W.3d 248,
256 (Tex. App.CHouston [14th Dist.] 2003, pet. ref=d). 

When, as here, the trial court does not make explicit
findings of fact, we review the evidence in the light most favorable to the
court=s ruling and
assume the court made implicit findings of fact that support its ruling as long
as those facts are supported by the record.  Carmouche v. State, 10
S.W.3d 323, 328 (Tex. Crim. App. 2000).  If the trial judge=s decision is
correct under any theory of law applicable to the case, the decision will be
sustained.  State v. Ross, 32 S.W.3d 853, 855B56 (Tex. Crim.
App. 2000).

A. Who Was the Arresting Officer?

Douglas was the only witness to testify at the suppression
hearing.  During direct examination, Douglas testified he was dispatched to
Memorial Hermannn Hospital at approximately 4:15 p.m. on April 24.  Upon
arrival, Douglas spoke to the first HPD officer on scene, as well as the nurses
and medical personnel who were treating Anthony.  Douglas testified that he
subsequently took appellant into custody, advised appellant of his Miranda rights,
and instructed another HPD officer to transport appellant to a different location. 
On cross-examination, Douglas gave the following testimony:

[defense counsel]:  Sergeant
Douglas, where at the hospital did you come into contact with Mr. Jefferson?

[Douglas]:              Mr.
Jefferson was seated in the rear seat of one of the patrol cars.

[defense counsel]:  So it wasn=t actually in the hospital, it was
on the outside somewhere?

[Douglas]:              Yes, sir.








[defense counsel]:  So someone had
already arrested him?

[Douglas]:              He was in
the back seat of one of the patrol cars; yes, sir. 

Based solely on Douglas=s response to the
leading question asked by appellant=s trial counsel,
appellant argues that he was under arrest prior to the time when Douglas
arrived at the hospital.[3] 
Douglas=s testimony that
appellant was Ain the back seat of one of the patrol cars@ is consistent
with either an investigative detention or an arrest.  Myers v. State,
203 S.W.3d 873, 884 (Tex. App.CEastland 2006, pet. ref=d); Francis v.
State, 896 S.W.2d 406, 411B12 (Tex. App.CHouston [1st
Dist.] 1995), pet. dism=d, 922 S.W.2d 176
(Tex. Crim. App. 1996).  Based on the evidence introduced at the suppression
hearing, and the trial court=s order denying appellant=s motion to
suppress, we find that the trial court implicitly ruled that Douglas was the
arresting officer.  See Carmouche, 10 S.W.3d at 328. Viewed in totality,
Douglas=s testimony does
not establish that appellant was already under arrest when Douglas first
encountered appellant.  Rather, Douglas=s testimony that
he took appellant into custody, Mirandized appellant, and instructed
another officer to transport appellant, supports the trial court=s finding that
Douglas was the arresting officer.

B. Did Detective Douglas Have Probable Cause to Arrest
Appellant?








In reviewing a warrantless arrest to determine the
existence of probable cause, we look to the facts known to the officer at the
time of the arrest.  Amores v. State, 816 S.W.2d 407, 415 (Tex. Crim.
App. 1991).  Probable cause exists where the facts and circumstances within the
officer=s knowledge and of
which he has reasonably trustworthy information are sufficient in themselves to
warrant a man of reasonable caution in the belief that a particular person has
committed or is committing an offense.  Id. at 413.  Whether probable
cause exists is determined by applying a Atotality of the
circumstances@ test.  Id.  Probable cause requires more than
mere suspicion but far less evidence than that needed to support a conviction
or even that needed to support a finding by a preponderance of the evidence.  Hughes
v. State, 24 S.W.3d 833, 838 (Tex. Crim. App. 2000).  An officer need not
have personal knowledge of an offense, and may rely on reasonably trustworthy
information provided by another person in making a probable cause assessment.  Astran
v. State, 799 S.W.2d 761, 764 (Tex. Crim. App. 1990). 

Appellant contends Douglas=s testimony at the
suppression hearing was conclusory and inadequate to establish probable cause
because Douglas did not testify to any facts from which the trial court could
independently determine the existence of probable cause to arrest.[4] 
We disagree.  Douglas testified he was aware that hospital personnel had made
an initial report of child abuse.  Upon arrival at the hospital, Douglas spoke
to the first HPD officer on scene, and the nurses and medical personnel who
were treating Anthony.  

Douglas testified he was informed by doctors and medical
personnel that Anthony was a five-year-old child with injuries caused by
non-accidental trauma.  Douglas learned that Anthony had been transported to
the hospital by appellant and Brewer.  Douglas also learned from medical
personnel that Anthony was appellant=s stepson, and
Anthony and appellant resided in the same household. Douglas testified he was
informed that appellant made statements to hospital personnel indicating
appellant was with Anthony when the injuries occurred.  Douglas testified he
spoke to appellant and appellant did not seem to be emotional or upset about
Anthony=s injuries. 
Douglas testified that the information he obtained from individuals at the
hospital led him to believe that Anthony had been assaulted by appellant. 








We hold that under the totality of the circumstances,
Douglas had probable cause to arrest appellant based on reasonably trustworthy
information indicating that appellant had assaulted Anthony.  See Astran,
799 S.W.2d at 764 (holding police officers may rely on reasonably trustworthy
information obtained form lay citizens in determining whether probable cause
for an arrest exists).  Accordingly, appellant=s statement to
Douglas was not the product of an illegal arrest and the trial court did not
err in denying appellant=s motion to suppress.  Appellant=s third issue is
overruled.  

II.
The Evidence is Legally and Factually Sufficient

In his first and second issues, appellant argues the
evidence is legally and factually insufficient to prove that he was the person
who caused the injuries to the child.

A. Standards of Review

            In a legal sufficiency
review, we view all the evidence in the light most favorable to the verdict and
determine whether any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt.  Jackson v. Virginia,
443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); Salinas v.
State, 163 S.W.3d 734, 737 (Tex. Crim. App. 2005).  The jury, as the sole
judge of the credibility of the witnesses, is free to believe or disbelieve all
or part of a witness=s testimony.  Jones v. State, 984 S.W.2d 254, 257
(Tex. Crim. App. 1998).  We do not engage in a second evaluation of the weight
and credibility of the evidence, but only ensure the jury reached a rational
decision.  Muniz v. State, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993); Harris
v. State, 164 S.W.3d 775, 784 (Tex. App.CHouston [14th Dist.] 2005, pet. ref=d).








In a
factual sufficiency review, we consider all the evidence in a neutral light.  Prible
v. State, 175 S.W.3d 724, 730B31 (Tex. Crim. App. 2005).  The
evidence may be factually insufficient in two ways.  Id. at 731.
 First, when considered by itself, evidence supporting the verdict may be
so weak the verdict is clearly wrong and manifestly unjust.  Id.  Second,
where the evidence both supports and contradicts the verdict, the contrary
evidence may be strong enough that the beyond-a-reasonable-doubt standard could
not have been met.  Id.  In conducting a factual sufficiency review, we
must employ appropriate deference so that we do not substitute our judgment for
that of the fact finder.  Jones v. State, 944 S.W.2d 642, 648 (Tex.
Crim. App. 1996).  Our analysis must consider the evidence appellant claims is
most important in allegedly undermining the jury=s verdict.  Sims v. State, 99
S.W.3d 600, 603 (Tex. Crim. App. 2003). 

B. Analysis

A person commits capital murder if he intentionally or
knowingly causes the death of an individual under six years of age.  Tex. Penal Code Ann. '' 19.02(b)(1),
19.03(a)(8).  The identity of the perpetrator of an offense can be proved by
direct or circumstantial evidence.  Earls v. State, 707 S.W.2d 82, 85
(Tex. Crim. App. 1986); Roberson v. State, 16 S.W.3d 156, 167 (Tex. App.CAustin 2000, pet.
ref=d).  

          Appellant
argues the evidence is legally and factually insufficient to prove he was the
person who caused Anthony=s injuries because no one saw him injure
the child.  Appellant further argues the evidence shows either appellant or
Brewer could have committed the crime and, therefore, is insufficient to
establish his guilt beyond a reasonable doubt.  Appellant contends the evidence
shows that Brewer was alone with Anthony for approximately twenty minutes
during the time when the child was fatally injured.  Appellant also directs us
to the following evidence which he claims is contrary to the jury=s verdict: (1)
appellant=s testimony that he did not hurt Anthony, (2) the
testimony of twelve defense witnesses who testified they had seen appellant
with children on prior occasions and never saw him mistreat any child, and (3)
testimony that Brewer did not have an emotional response after being informed
of the seriousness of Anthony=s injuries.   








The jury=s verdict that appellant caused the fatal
injuries to the child in this case is supported by appellant=s statement to
Douglas, Brewer=s testimony, and the testimony of numerous
medical experts, all of which are recounted in the Factual and Procedural
Background section above.  Appellant told Douglas that the only time Anthony=s injuries could
have occurred was when appellant was Aslamming@ him.  Appellant
also stated that he was alone in the room with Anthony when his injuries
occurred.  Appellant further stated that Anthony was not able to sit up in the
bathtub and began having difficulty breathingCall of which
occurred before appellant left Anthony alone in the apartment with Brewer. 
Brewer testified she heard the sound of appellant Awhipping@ Anthony in the
bedroom, then heard a loud banging noise.  Brewer testified Anthony was limp
and unresponsive at all times thereafter.  Medical experts, including Dr. Bu
and Dr. Smiley, testified that Anthony would have been incapacitated
immediately after receiving the fatal head injuries.   

In his appellate brief, appellant directs us to portions of
his testimony at trial which are contradicted by the testimony of Brewer and
appellant=s own statement to Douglas.  The jury may believe or
disbelieve all or part of any witness=s testimony. Jones,
984 S.W.2d at 257.  Reconciliation of any conflicts in the evidence falls
within the exclusive province of the jury. Heiselbetz v. State, 906
S.W.2d 500, 504 (Tex. Crim. App. 1995) (en banc). Thus, the jury was entitled
to believe Brewer=s testimony and appellant=s statement to
Douglas, or any portions thereof, regardless of conflicting testimony offered
by appellant at trial.  








We have
reviewed the entire record in this case.  When viewed in the light most
favorable to the verdict, we find the evidence supports a determination beyond
a reasonable doubt that appellant intentionally or knowingly caused the death
of Anthony.  See Salinas, 163 S.W.3d at 737.  When considering
all the evidence in a neutral light, we find that the contrary evidence is not
so strong that the beyond-a-reasonable-doubt standard could not have been met,
nor is the evidence supporting the verdict so weak it is clearly wrong and
manifestly unjust.  See Prible, 175 S.W.3d at 730B31.  The evidence
is legally and factually sufficient.  Accordingly, we overrule appellant=s first and second
issues.

                                                          Conclusion

Having overruled each of appellant=s issues, we
affirm the judgment of the trial court.

 

 

 

 

 

/s/      John S. Anderson

Justice

 

 

 

 

Judgment rendered
and Memorandum Opinion filed May 17, 2007.

Panel consists of
Justices Yates, Anderson, and Hudson.

Do Not Publish C Tex. R. App. P. 47.2(b).

 









[1]  Dr. Sharon Walker, a psychologist employed by
Children=s Protective Services, testified Amanda Brewer has an
IQ score of 52.  Walker further testified that Brewer has a significant
cognitive deficit which could cause her to exhibit inappropriate emotional
responses.  





[2]  Appellant is six foot four inches tall and weights 240 pounds.  Anthony
was three foot ten inches tall and weighed approximately forty-nine pounds. 

 





[3]  Appellant=s
brief contains conflicting arguments regarding his third issue.  In his brief,
appellant describes Douglas as Athe arresting
officer@ and focuses the majority of his argument on the
alleged lack of probable cause for Douglas to arrest appellant.  However,
appellant also argues, based on the testimony quoted above, that Douglas was
not the arresting officer. 





[4]  In his appellate brief, appellant concedes that he failed to raise any
arguments at trial regarding the State=s alleged failure to prove the existence of an exception to
the warrant requirement, and has therefore waived that issue on appeal.  Accordingly,
the scope of our review is limited to the trial court=s finding that Douglas had probable
cause to arrest appellant.